KELLY, Circuit Judge,
dissenting.
In my view, Kent Bernbeck has standing to bring this suit to challenge the Nebraska Constitution’s “signature-distribution requirement.” See Neb. Const, art. Ill § 2. Under that provision, an individual seeking to place an initiative on the ballot must collect signatures in support of the initiative from at least five percent of the registered voters in at least two-fifths of Nebraska’s 93 counties. Bernbeck contends, and the district court agreed, that this requirement violates the Equal Protection Clause because Nebraska’s counties vary widely in population, so the signature-distribution requirement gives disproportionate influence to voters in sparsely-populated counties. Instead of dismissing his case for want of jurisdiction, a ground neither party was given a chance to brief to this court, I believe the court should consider and decide Bern-beck’s claim that Nebraska’s signature-distribution requirement for placing initiatives on the ballot violates the Equal Protection Clause.
*651 Bernbeck stated and evidenced an intention to place a specific initiative on the November 2014 ballot, an intention that he alleges would be thwarted — or at least made more expensive — by Nebraska’s signature-distribution requirement. Courts have consistently held that an intention to gain access to a ballot in a specific upcoming election confers standing to challenge ballot-access restrictions, regardless of whether the challenger attempted to satisfy the restrictions. See Storer v. Brown, 415 U.S. 724, 738 n.9, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (holding that “it is [the candidates’] names that go on the California ballot for consideration of the voters” and “[wjithout the necessary signatures this will not occur,” so “[i]t is apparent ... that [they] have ample standing to challenge the signature requirement”);[7] Green Party of Tenn. v. Hargett, 767 F.3d 533, 542-45 & n. 1 (6th Cir. 2014) (holding that plaintiffs had standing to pursue ballot-access claim despite not complying with signature-gathering requirement); Nader v. Keith, 385 F.3d 729, 736 (7th Cir. 2004) (“There would be no question of [plaintiffs] standing to seek [an injunction to place him on the ballot] in advance of the submission or even collection of any petitions.”); Texas Indep. Party v. Kirk, 84 F.3d 178, 187 n.9 (5th Cir. 1996) (holding that candidates had standing to challenge requirement that signature petitions include voter registration numbers despite not having submitted petitions); Stevenson v. State Bd. of Elections, 638 F.Supp. 547, 549 (N.D. Ill.) (“The defendants in this case all suggest that the plaintiffs have no standing because they have not tendered at this late date their petitions before the board and had them rejected. But this gesture of formality is unnecessary.”), aff'd 794 F.2d 1176 (7th Cir. 1986) (adopting district court opinion); see also Am. Party of Tex. v. White, 415 U.S. 767, 778-79, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (deciding challenge by Texas New Party to requirement that parties gather signatures of 1% of voters to qualify for ballot despite fact that it “apparently made no effort to comply with the 1% requirement”); Williams v. Rhodes, 393 U.S. 23, 28, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (deciding appeal regard-, ing signature requirement for Socialist Labor Party despite the fact that “it ha[d] not filed petitions with the total signatures required under new Ohio laws for ballot position, and indeed it conceded it could not do so this year”); Jenness v. Fortson, 403 U.S. 431, 432, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (deciding challenge to requirements for filing petition to run as independent candidate despite fact that petitioners had not submitted petitions); McCarthy v. Briscoe, 429 U.S. 1317, 1319, 1323-24, 97 S.Ct. 10, 50 L.Ed.2d 49 (1976) (Powell, J., in chambers) (ordering Texas to put Eugene McCarthy’s name on ballot despite the fact that he had not attempted to qualify for the ballot by joining a political party); Lee v. Keith, 463 F.3d 763, 765, 767 (7th Cir. 2006) (deciding challenge from candidate though “he could not muster the required number of signatures by the deadline so distant from the general *652 election” because the “statutes [he] challenges thwarted his bid to appear on the ballot and continue to restrict potential independent candidacies”).[8]
Indeed, it is unclear what more the court would demand of Bernbeck before allowing him to challenge the signature-distribution requirement. Would it be enough to simply make an unsuccessful effort to collect signatures? Would he have to submit a signature verification that lacked an adequate number of signatures, knowing that government officials would have to reject it? Or would he be required to satisfy the signature-distribution requirement and submit a valid signature verification in order to be able to argue to a court that the signature-distribution requirement was barring his access to the ballot? ■
The court relies on two precedents, neither of them voting-rights cases, to conclude that Bernbeck lacks standing. The first, Lujan v. Defenders of Wildlife, involved a challenge by environmental groups to an agency interpretation of the Endangered Species Act of 1973, which they claimed would increase the rate of extinction of endangered species. See 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Supreme Court held that one of the organizations could not establish standing based on the fact that two of its members intended to travel to observe some of the allegedly affected species at some indefinite point in the future. See id. at 563-64, 112 S.Ct. 2130. Crucial to the Court’s analysis was the fact that the members in question had not specified when they planned to view the endangered *653 animals: It explained that “ ‘some day’ intentions — without any description of concrete plans, or indeed any specification of when the some day will be — do not support a finding of the ‘actual or imminent’ injury that our cases require.” Id. at 564, 112 S.Ct. 2130.
This case is quite unlike Lujan in that Bernbeck’s injury was not alleged to occur at “some indefinite future time,” but within a definite time frame: by the next election. Id. at 564 n.2, 112 S.Ct. 2130. Bernbeck didn’t just state an intention to place an initiative on the November 2014 ballot, he backed up his intentions by submitting to the Nebraska Secretary of State on July 23, 2012, a sworn statement and sample initiative petition, the first step to placing an initiative on the ballot. Under Nebraska law, the sworn statement and sample petition would have expired if Bernbeck did not manage to file a petition with sufficient signatures by July 4, 2014. See Neb. Rev. Stat. §§ 32 — 1407(1)—(2). As a result, there would have been no point to filing them unless Bernbeck meant tó place an initiative on the November 4, 2014, ballot — the ballot for the “next general election occurring at least four months after” the filing — as opposed to some ballot in the indefinite future. Id.
The second precedent relied on by the court is Pucket v. Hot Springs School District No. 23-2, which held that when there is a precondition to receiving a government benefit, a plaintiff must attempt to satisfy the precondition in order to have standing to challenge the denial of the benefit. See 526 F.3d 1151, 1161 (8th Cir. 2008). Pucket involved a challenge by students and parents at a private religious school to their local school district’s decision to end busing services. See id. at 1154. This court dismissed the case for lack of standing, in part because the plaintiffs never requested that the school district reinstate busing. See id at 1161-62.
But in this case, gathering signatures is not a “precondition” to receiving a government benefit, the denial of which would constitute an injury — it is itself the alleged injury. Bernbeck alleges he was injured not just by his inability to place an initiative on the November 2014 ballot, but by the increased cost of gathering signatures in Nebraska’s sparsely-populated counties imposed by the signature-distribution requirement. Bernbeck’s complaint states that because of the signature-distribution requirement,
[t]he human resources costs, financial resources costs, and time resources costs of exercising his rights are dramatically increased because he must [de]ploy his time and the time of others to sparsely populated counties to collect only -a few signatures at a substantially greater human resources, time and financial cost.
The court suggests that this alleged injury is relevant only to Bernbeck’s First Amendment claim, but that is not what his complaint says.[9] Rather, his claim is that *654 because the signature-distribution requirement overweights the signatures of residents of sparsely-populated counties in violation of the Equal Protection Clause, he has to spend money gathering signatures in those counties that he otherwise would not have to spend.
If Bernbeck had attempted to gather signatures, he would have incurred economic harm that would result in standing. See Wallace v. ConAgra Foods, Inc., 747 F.3d 1025, 1029 (8th Cir. 2014) (“When the alleged harm is ‘economic,’ ‘the “injury in fact” question is straightforward.’” (citation omitted)); Krislov v. Rednour, 226 F.3d 851, 857 (7th Cir. 2000) (holding that plaintiffs suffered injury because they “were required to allocate additional campaign resources to gather signatures”). The same is true even though Bernbeck’s “own acts ... eliminate[d] the imminent threat of harm.” MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (holding that patent licensee had standing to challenge patent’s validity despite the fact that its payment of royalties “ma[de] what would otherwise be an imminent threat [of suit] at least remote, if not nonexistent”). If a “rule that a plaintiff must destroy a large building, bet the farm, or ... risk treble damages and the loss of 80 percent of its business before seeking a declaration of its actively contested legal rights finds no support in Article III,” neither does a rule that a plaintiff must spend the money needed to collect signatures in order to litigate the validity of the signature-gathering requirement. Id. at 134, 127 S.Ct. 764. Say the Nebraska Constitution required residents of sparsely-populated counties to pay a fee of $50 to place an initiative on the ballot, but required residents of the most populous counties to pay $500,000. Under the court’s rationale, Bernbeck, as a resident of a populous county, would be unable to bring an equal protection challenge without attempting to satisfy the “precondition” by paying the half-million-dollar fee. That cannot be right.
But even assuming for the sake of argument that attempting to satisfy the signature-distribution requirement is a “precondition,” as Pucket defines the term, Pucket made clear that “we may find a plaintiff has standing even if he or she has failed to take steps to satisfy a precondition if the attempt would have been futile.” Pucket, 526 F.3d at 1162 (collecting cases). The record here indicates that it would have been futile for Bernbeck to attempt to gather signatures for the petition he submitted on July 23, 2012. It is possible to say this with some assurance because Bernbeck submitted almost the exact same petition in January 2012, and undertook considerable efforts to gather signatures for it, “travelling] and sp[eaking] at gatherings, meetings and collecting] signatures throughout the state in an effort to qualify the requisite number of counties as dictated by the signature distribution requirements set out in the State Constitution.” But these efforts were unsuccessful because of the signature-distribution requirement:
In January, 2012, I submitted a signed affidavit to the Secretary of State to initiate a constitutional amendment to the State Constitution to lower signature thresholds for statewide initiative and referendum petitions. ... The deadline for submission of signatures was July, 2012. As of the July 2012 signature deadline, we failed to meet the distribution requirements and the signature threshold for our constitutional amendment to be placed on the November 2012 ballot. I believe the resources spent qualifying rural Nebraska counties had a severe and contributing impact on my ability to gain ballot placement.
*655 These events convinced Bernbeck that attempting to satisfy the signature-distribution requirement again would be futile; in a declaration filed with the district court, he stated:
I realized that my right to engage in expression of my interest in ballot issues was persistently being thwarted by State laws ... requiring that I achieve a virtually impossible geographic distribution of petition signers. ... Even if I achieved enough signatures to reach the total number of all signatures required as a fraction of the entire general election vote at the preceding election for Governor by circulating my petitions in Douglas and Lancaster Counties only, my efforts would fail because I did not have enough signatures from the least populous counties in the state.
As there was no countervailing evidence submitted by Nebraska’s Secretary of State, the sole evidence in the record indicates that Bernbeck’s July 2012 petition would have been as unsuccessful as his January 2012 petition, rendering any attempt to gather signatures futile. Under these circumstances, his failure to attempt to gather signatures to place his initiative on the ballot does not deprive him of standing.
• Finally, Bernbeck has an independent basis for standing based on his interest as a petition signer. The court recognizes this possibility, but rejects it on the basis that “[n]owhere in the complaint nor the record can we find any averment or evidence that Bernbeck is registered to vote.” Ante at 651. But paragraph 37 of Bernbeck’s complaint states that “Bernbeck is a single voter.” The most reasonable reading of this statement is that Bernbeck is a registered voter, for there is no such thing as an unregistered voter except in the limited circumstance of a new arrival to Nebraska. See Neb. Rev. Stat. § 32 — 933(l)(a). Bern-beck’s status as a registered voter qualifies him as a petition signer, and provides an independent basis for standing to challenge laws restricting access to the ballot. See McLain v. Meier, 851 F.2d 1045, 1048 (8th Cir. 1988) (holding that a candidate had standing as a voter to challenge restrictive ballot-access laws).
Because Bernbeck has standing to bring his equal protection challenge, I would proceed to the merits of this case.

. The court attempts to distinguish Storer, alone among the cited cases, on its facts, pointing out that two of the petitioners claimed in their brief to have submitted 25,-000 signatures. Ante at 648 n. 4. But the point of the’ lawsuit was that the 25,000 signatures fell far short of the number California required of the candidates to place their names on the ballot — a number the respondents estimated at 325,000. Storer, 415 U.S. at 739, 94 S.Ct. 1274. It is true that no party in Storer advanced the approach to standing that this court now endorses, but what Storer held was that a candidate who seeks to place his or her name on a ballot and is prevented from doing so by a signature-gathering requirement has standing to challenge that requirement. That holding is inconsistent with the court’s decision here.

. The court dismisses these cases on the basis that the right to vote for political representatives, unlike the right to participate in initiatives, is provided by the United States Constitution. Ante at 648 n. 4. But in point of fact, many of the cited cases involve federal presidential elections, and "[t]he individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college.” Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam); see Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) ("[T]he Constitution 'does not confer the right of suffrage upon any one.’ ” (quoting Minor v. Happersett, 88 U.S. (21 Wall.) 162, 178, 22 L.Ed. 627 (1874))); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (noting that "the right to vote, per se, is not a constitutionally protected right”). Consistent with this principle, a number of states did not hold popular elections to choose their presidential electors until decades after the ratification of the Constitution; South Carolina's electors were chosen by its legislature as late as 1860. See McPherson v. Blacker, 146 U.S. 1, 29-33, 13 S.Ct. 3, 36 L.Ed. 869 (1892). The constitutioñal guarantee of equal protection comes into play only when the state decides to grant its citizens the right to vote for presidential electors. See Bush, 531 U.S. at 104-05, 121 S.Ct. 525 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person’s vote over that of another.”); San Antonio Indep. Sch. Dist., 411 U.S. at 45 n.78, 93 S.Ct. 1278 (explaining that “the right to vote” is shorthand for the right "to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population"). In this respect state initiatives are exactly parallel to presidential elections: the state is not obligated to provide for them, but must respect the Equal Protection Clause if it chooses to do so.
But even if there were a distinction between the constitutional protection afforded to voting for candidates as opposed to initiatives, that would simply go to the merits of Bern-beck's claims, not his standing. The difference between a classification that affects a fundamental right and one that does not is that challenges to the former trigger heightened scrutiny. See Stiles v. Blunt, 912 F.2d 260, 263 (8th Cir. 1990). However, there is no difference in what a plaintiff must demonstrate to show standing.

. Moreover, the court's suggestion that this alleged injury is relevant to Bernbeck’s First Amendment claim is inconsistent with its later conclusion that it lacks jurisdiction even over his First Amendment claim. Ante at 650 n.6. Bernbeck did not cross-appeal the denial of his First Amendment challenge to the signature-distribution requirement, but he didn’t have to: because success on the First Amendment claim would entitle Bernbeck to the same relief he obtained below, the claim is simply an alternative ground for affirmance. See United States v. Hirani, 824 F.3d 741, 751-52, 2016 WL 3064743, at *7 (8th Cir. May 31, 2016) ("We review judgments, not opinions, and we may affirm a judgment on any ground supported by the record.” (citation omitted)); Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) ("[T]he party that prevailed in the district court need not file a cross-appeal to raise alternative grounds for affirmance.” (citátion omitted)).